Enoch **THOMPSON** et al., Appellants,

v.

Basil **MILLS**, Administrator of Estate of Walter W. Bonza, Appellee.

Court of Appeals of Kentucky.

Oct. 4, 1968.

Robert H. Helton, Jr., Brown, Tooms & Helton, London, for appellants.

Farmer Helton, Pineville, Marion Rider, Frankfort, for appellee.

PALMORE, Judge.

Walter W. Bonza was killed in a collision between a candy truck driven by him and a milk truck owned by C. T. Massey and driven by Enoch Thompson. In this wrongful death action against Thompson and Massey a jury awarded Bonza's administrator $50,000. Thompson and Massey appeal, contending that the trial court erred in failing (1) to direct a verdict for them, (2) to grant a continuance, and (3) to order a new trial on the ground of new-ly discovered evidence, and in certain other respects, and that the award was excessive. As the proceeding must be reversed on other grounds we shall not discuss the amount of the verdict.

The accident happened on U.S. Highway 119 about six miles east of Pineville, at which point the highway runs east and west bordered on the north by the foot of Pine Mountain and on the south by the banks of Cumberland River. It is intersected from the south by Page Bridge road, which crosses the river. 187 feet east of the center line of Page Bridge road is a parking area located between the highway and the river. This area, from which the candy truck had emerged just before the collision, fronts 246 feet on the south side of highway 119. The highway has a 24-foot blacktop surface, 12 feet for each traffic lane, and curves very gently to the left as it extends eastwardly.

At about 9:30 in the morning of September 15, 1965, Thompson was driving the milk truck eastwardly from Pineville toward Harlan. Bonza, coming from the opposite direction, had pulled his candy truck into the parking area and stopped. It had been raining. The highway was wet and slippery. Though Thompson denied it, a state trooper who later investigated the accident testified that all four tires of the milk truck were worn and slick. It was a 1½ ton vehicle on which a tank had been mounted. The truck weighed 9,000 pounds and its tank was about two-thirds full with 13,958 pounds of milk. The parking area and Bonza's candy truck came into Thompson's view from a distance of about ¼ mile. According to Thompson the candy truck was stopped 10 or 15 feet off the highway facing at an angle toward Pineville. His version of the accident is that he was moving at a speed of 35 to 40 m.p.h., that he sounded his horn and took his foot from the accelerator as soon as he saw the candy truck, that when he "got on the far end of the bridge" (that is, when he passed the east side of Page Bridge road, the center of which is 187 feet from

the parking area) the candy truck suddenly moved out onto the highway, whereupon he immediately applied his brakes, which caused his truck to slide sideways and turn around in the highway, striking the candy truck with its rear end.

The milk truck was 23 feet long. Thompson estimated that he was within three or four truck lengths of the candy truck when it came into the highway, though it is established that the distance between the parking area and the center of Page Bridge road is 187 feet. He estimated also that the front wheels of the candy truck were half way between the south edge and center of the pavement when the milk truck slid around and his view was cut off.

The physical evidence is that the main impact was between the rear end of the milk truck and the left front portion of the candy truck. The debris from the accident was scattered over the north or westbound traffic lane. The milk truck came to rest on its right side, crosswise, its rear end on the north shoulder and its front end partially across the north half of the highway. The candy truck came to rest east of the milk truck in a ditch bordering the north shoulder.

The state trooper whom we have mentioned testified also that the milk truck left skid marks leading from the center line to the north shoulder of the highway, but unfortunately neither of the attorneys asked and he never did say where these marks, the debris, or even the wrecked vehicles themselves were located in relation to the west extremity of the parking area and the Page Bridge road intersection.

Lewis Wilder, testifying for the plaintiff, saw the milk truck go past the end of the Page Bridge road turning sidewise, its rear end toward the river and its engine toward the mountainside. He heard the ensuing collision, but trees between the point of impact and his place of vantage prevented his seeing it.

■ Before proceeding to the testimony of Britt Howard, a controversial witness about whom more must be said later, we shall take up the argument that the defendants were entitled to a directed verdict. It is our opinion that the evidence thus far narrated was enough to justify submission of the case to the jury. The salient circumstances leading to that conclusion are that the milk truck went out of control and the collision took place on its wrong side of the highway. And Wilder's testimony that the truck was already out of control at a point at least 187 feet from the parking area would give reasonable support to an inference that when Bonza entered the highway the milk truck was not bearing down upon him so closely as to present an immediate hazard to his reaching the westbound lane in time for safe passage.

Other witnesses gave testimony more favorable to the defendants, but counsel will recognize of course that a jury must be allowed to draw whatever inferences the evidence will reasonably support.

It will be recognized also that few if any cases are exactly alike, and we do not find those relied on by the defendants sufficiently similar to this one to require a finding that Bonza was negligent as a matter of law. Brumbach v. Day, Ky., 260 S.W.2d 939 (1953); Couch v. Hensley, Ky., 305 S.W.2d 765 (1957), and Riggs v. Miller, Ky., 396 S.W.2d 69 (1965), were rear-end collision cases in which one vehicle entered the superior highway and blocked the traffic lane occupied by an approaching vehicle when it was too late or not possible for the latter to avoid a collision by altering its course. In Manning v. Claxon's Ex'x, Ky., 283 S.W.2d 704 (1955), the intruding vehicle turned across the highway in an attempt to get ahead of and in the same lane of traffic occupied by the oncoming vehicle and was struck in the side. In Vaughn v. Jones, Ky., 257 S.W.2d 583 (1953), the driver of the automobile that entered a superior highway and was struck on the side should have seen but admitted he did not see the approaching car and

thus admitted his own negligence. In Chambliss v. Lewis, Ky., 382 S.W.2d 207 (1964), the intruding automobile was struck in the side as its driver attempted to get across the superior highway before the approaching car reached the intersection. In none of these cases does it appear that there was evidence to support a conclusion that in view of the observable circumstances the driver of the vehicle entering onto the superior highway could reasonably have assumed that the oncoming vehicle would remain in its proper traffic lane and, if so, that he had sufficient time to cross and clear that lane safely.

■ It seems to us that there is some degree of difference between the case in which the vehicle with the right-of-way must shift direction in order to avoid a collision and the case in which it need only to maintain its course. We do not imply that the driver must stay fast in the face of an apparent emergency—only that from the standpoint of contributory negligence on the part of the other driver there is more reason to expect the oncoming vehicle to hold its course than to change it. To put this thought into more practical terms, there is less room for a directed verdict when the collision is on the defendant's wrong side of the road than would be so if it happened in his proper traffic lane. The burden of proving contributory negligence is, of course, on the defendants, and we cannot say in this case that it was established beyond the province of a jury to remain unconvinced of it.

The trial court accepted and gave to the jury all of the instructions offered by the defendants. The one enumerating Thompson's duties in driving the milk truck placed on him the duty of traveling on his right-hand side of the highway unless Bonza suddenly drove onto the highway so near to the approaching milk truck that it was necessary, or reasonably appeared so to Thompson, for Thompson to turn into his left side of the highway in order to avoid the collision. The one enumerating Bonza's duties required that he not proceed into the highway if another vehicle was approaching so closely as to constitute an immediate hazard.

In addition to the full set of instructions tendered by the defendants the trial court gave, as No. 1, a single instruction offered by the plaintiff, as follows:

"It was the duty of each of the operators of the motor vehicles described in the testimony herein, Enoch Thompson and Walter William Bonza to yield to each other, as nearly as possible, one-half of the highway when passing each other."

■ We agree that this instruction was not applicable and should not have been given. It is unnecessary to determine whether it was prejudicial. If the evidence is substantially the same upon retrial it should not be given.

The witness Britt Howard testified for the plaintiff that he was driving from Pineville toward Harlan, that the milk truck passed him at a speed of 75 to 80 m. p.h. as they approached the scene of the accident, and that when the candy truck entered the highway and the milk truck's brake lights came on the distance between the two trucks was 900 to 1,000 feet. The facts we shall narrate are taken from affidavits and counteraffidavits filed in connection with the defendants' motions for a continuance and for a new trial.

The case went to trial on April 13, 1966. On January 21, 1966, defendants had taken plaintiff's deposition for discovery purposes. Plaintiff was asked if he knew of anyone claiming to have been an eyewitness. He named but one, the witness Andrew Miracle, who later testified for the defense. He did not name Howard, and it may be assumed that he did not then know Howard was or purported to be a witness. However, in October of 1965 his attorney (who was present at the taking of the deposition) had obtained a written statement from Howard showing that he was an eyewitness and was accompanied by his wife at the time he saw the accident. On

March 23, 1966, defendants served interrogatories on the plaintiff in which he was asked to give the names and addresses of any persons known by him or his attorney as having any knowledge of the accident or of the surrounding circumstances. The response to these interrogatories was signed on April 4, 1966, and served on April 6, 1966, one week before the trial date, and it was then that defendants were first informed that Howard claimed to be a witness. Howard's wife was not named in the response.

Four days before the trial defendants sent an investigator to interview Howard, which he did, though he was unable to get a written statement. Howard says he told the investigator his wife was with him when he saw the accident, but the investigator says he did not. On the morning of the trial defendants asked the court for and were granted permission to interview Howard, and it was only then, they say, that they learned Howard's wife was a passenger in his car at the time he claims to have witnessed the accident. Defendants promptly moved for a continuance and filed a supporting affidavit reciting the substance of the foregoing information. The motion was overruled.

Mrs. Howard did not testify as a witness. Shortly after the trial she was interviewed in behalf of the defendants and gave answers under oath in which she said that she and her husband came upon the scene of the accident after it had happened and that they were going toward Pineville, not from Pineville toward Harlan. Whereas her husband testified that they had been to a physician's office in Pineville and were on the way home, Mrs. Howard stated that they were on the way to a dentist's office in Pineville, where she had a tooth pulled later in the morning. In short, if her statement is true Howard grossly perjured himself in the trial of the case. Defendants promptly moved for a new trial and included Mrs. Howard's statement as newly discovered evidence. This motion also was overruled.

We think it is beyond question that the failure to give Mrs. Howard's name in answer to the interrogatory was a prejudicial obstruction to the discovery rights accorded to the defendants by CR 26 and CR 33. See, specifically, CR 26.02. "It seems clear that a party may by discovery deposition (either upon oral examination or written interrogatories) obtain from the opposing party, or any other witness, *the names and addresses of known persons having knowledge of the relevant facts.* This is specifically provided in the Rule and has been well recognized." Clay, Kentucky Practice, CR 26.02, Comment 4, citing Grauman, Deposition and Discovery, 47 Ky. Law Journal 175, and annotation, *Names and addresses of witnesses to accident or incident as subject of pretrial discovery,* 37 A.L.R.2d 1152. Upon a showing of the failure of plaintiff to include Mrs. Howard's name in his response to the interrogatory the defendants were entitled to a continuance; and upon the further information provided in support of their post-trial motion they were and are entitled to a new trial.

This case must be reversed because of the prejudicial effect of plaintiff's failure to name Mrs. Howard in response to the CR 33 interrogatory. Whether the failure of his counsel to come forward with the name of Britt Howard at the time the discovery deposition was taken in January of 1966 also violated the defendants' rights of discovery, and whether such rights were waived by the failure to object to Howard's appearance as a witness, are questions we need not decide. We call attention, however, to the fact that if a proper inquiry is made concerning "the identity and location of persons having knowledge of relevant facts" (CR 26.02) and "is made in the language of the rule, simply, and without reference to any personal knowledge of the opposite party, all information available to the interrogated party must be supplied. This includes information possessed by, or within the knowledge of, the party's attorney, investigators employed by

or on behalf of the party, the party's insurer, and agents or representatives of the party * * *" whether personally known to the party or not. Wycoff v. Nichols, 32 F.R.D. 370 (W.D.Mo.1963). This being the principle applicable to written interrogatories, we perceive no reason why it should not apply also to discovery depositions provided the question is not based upon the witness's personal knowledge. In this instance, of course, it was predicated on the plaintiff's own knowledge.

■■■ Another point which may arise again in a retrial of the case concerns the action of the trial court in permitting the plaintiff, administrator of Bonza's estate, to testify in chief after other witnesses for the plaintiff had testified. Cf. KRS 421.-210(3). The substance of the administrator's evidence consisted entirely of matters that could have been adduced through other witnesses. We do not see what possible prejudice could have been done by his appearing after some of the other evidence had gone in. As a practical matter, in the absence of prejudice the order of testimony lies within the discretion of the trial judge for the simple reason that it is inconsequential. Cf. Brown v. Smiley, Ky., 428 S.W.2d 217, 221 (1968).

The judgment is reversed with directions for a new trial.

All concur.